UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OUR PET PROJECT LLC , | ) |
| | ) |
| Plaintiff, | ) Case No. 22 cv 1209 |
| | ) |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| INTERNATIONAL PAPER COMPANY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff, Our Pet Project, LLC, through its attorney, and for its Complaint against Defendant, International Paper Company, alleges the following:

### I. THE PARTIES AND JURISDICTION

1. International Paper Company ("Defendant" or "IP") is the internationally-known manufacturer of renewable, fiber-based packaging, pulp, paper, and other products. IP is organized and existing under the laws of the State of New York. IP's global headquarters is located in Memphis, Tennessee. According to its website at https://www.internationalpaper.com/company, IP has manufacturing operations in North America, Latin America, Europe, North Africa and Russia; and it has more than 25,000 customers and employs more than 50,000 employees throughout the world.

2. Plaintiff Our Pet Project ("Plaintiff" or "OPP") is a limited liability company, organized and existing under Illinois law; and is resident and a citizen of the State of Illinois. Its principal and sole manager is Ms. Carol Smeja.

3. This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332: The amount in controversy exceeds $75,000, exclusive of interest and costs; Plaintiff is a citizen of the State of Illinois; and Defendant is a citizen of the State of Tennessee.

4. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district; and (iii) Defendants conducted business within this judicial district at all times relevant to this Complaint.

## II. FACTS

**THRIVE material production and its failure**

5. Plaintiff is the originator of a certain product known as "The Original mine Pet Platter", a patented feeding tray for domesticated pets, including cats and dogs.

6. The "The Original mine Pet Platter" product has been manufactured beginning in July, 2016.

7. The Original mine Pet Platter has been manufactured from a composite blend of materials that includes renewable cellulose mixed with polypropylene, a type of plastic, using a specific formula called "THRIVE".

8. THRIVE was originally formulated and supplied to Plaintiff and many other customers by Weyerhaeuser, and Weyerhaeuser applied for several patents on THRIVE, both in the United States and internationally.

9. At that time, Weyerhaeuser was a manufacturer of certain paper, commercial and consumer products, among other things.

10. Plaintiff originally sought to manufacture its products from a sustainable resource to create a BPA-free product, consisting of a more natural material than typical plastics being

used by other pet-industry competitors at the time; strong and safe enough to endure pet interaction with no exposure to dangerous toxins; non-porous and dishwasher-safe; and made in the United States.

11. Plaintiff learned about THRIVE material prior to the completion of development of its product, and contacted Weyerhaeuser; and Weyerhaeuser expressed great interest in working with Plaintiff to develop its products, and to jointly market its products and the THRIVE material from which it would be made. *See, e.g.*, Exhibit 1, February 9, 2015 letter from Weyerhaeuser to Plaintiff.

12. Plaintiff was directed by Weyerhaeuser's representatives and consultants to a specific manufacturing processor familiar with the THRIVE product, United Plastic Molders, Inc. ("UPM").

13. Weyerhaeuser represented that its THRIVE product consisted of a specific combination of ingredients, including cellulose fiber derived from wood pulp, mixed together in a proprietary formula owned by Weyerhaeuser.

14. UPM became the original production manufacturer producing the "The Original mine Pet Platter" product, starting in 2016, and using Weyerhaeuser's formulation of THRIVE, reflecting labeling that advertised the product as "Food Safe, BPA Free, Made in USA, Dishwasher Safe, Sustainable, Recyclable and 100% SFI (Sustainable Forestry Initiative) Compliant".

15. UPM experienced no unusual production difficulties or issues in the production of Plaintiff's products while using the THRIVE material supplied by Weyerhaeuser.

16. Consistent with the parties' earlier discussions, Plaintiff's products included reference to the THRIVE composite in its marketing and packaging materials.

17. The Original mine Pet Platter was a successful product for Plaintiff, with orders in the thousands of dollars placed in 2016, the first year of sales of its production, and an increase in orders in 2017.

18. In its second year of production, Plaintiff increased the sales of The Original mine Pet Platter by 300% over its initial first year of production, through online sales direct to consumers and through retail sales through a variety of pet supply stores.

19. In December, 2016, Plaintiff was informed that Defendant IP would acquire THRIVE, as IP was to acquire the cellulose division and certain assets from Weyerhaeuser.

20. IP began thereafter to supply many customers, including Plaintiff, with the THRIVE material mixture.

21. Plaintiff expressed great concern to IP about the acquisition and its continued supply of THRIVE, because the end result of Plaintiff's establishment of a successful working relationship with Weyerhaeuser, and its significant investment in the development process and selection of material, was a product that worked completely as intended.

22. IP told Plaintiff that IP would continue to be responsible for producing and overseeing quality control of THRIVE material; that the mixture comprising THRIVE would remain the same as it had when produced by Weyerhaeuser; that members of Weyerhaeuser's THRIVE team would continue to be employed by IP, following the acquisition by IP of Weyerhaeuser's cellulose division; and that the transition from Weyerhaeuser would be "seamless" in connection with the supply to Plaintiff of THRIVE for its production of the The Original mine Pet Platter product.

23. IP continued to prosecute the application of certain patents on THRIVE following the acquisition.

24. However, after the supplies of THRIVE that were previously provided to manufacture Plaintiff's product had been exhausted, and UPM began using THRIVE material supplied by Defendant International Paper in 2018, and as Plaintiff's products continued to be placed in retail stores and to be sold online, Plaintiff began to observe, and to receive complaints from its customers about the failed quality of its products, and many customers demanded refunds and/or replacement products which were honored by Plaintiff.

25. Plaintiff's products suddenly appeared, following production, with "undispersed cellulose fibers" (as described by IP's representatives) across all physical areas of the product, including the front, back and sides, which had never been seen before. Plaintiff advised IP immediately upon learning of the production of defective products.

26. IP requested that Plaintiff open every box of product that had been shipped, and to count the number of Pet Platters displaying these fibers, in order to quantify the magnitude of the problem.

27. The count of defective products ranged from 70% to 89% of each size and color of Plaintiff's product.

28. IP concluded that an improper moisture content was responsible for the product defect; and sent new THRIVE material to UPM. In addition, IP stated that it had introduced a highly-documented Quality Control plan to ensure that no additional manufacturing problems would occur.

29. However, IP had changed the composition of the THRIVE product from that produced through Weyerhaeuser.

30. IP concealed from Plaintiff that it had changed the composition of the THRIVE product from that produced through Weyerhaeuser; and that its changes made a material difference in the suitability of the material for use in manufacturing Plaintiff's products.

31. As Defendant knows and as its records will reflect, Plaintiff never consented in any manner, nor authorized, desired or permitted Defendant to make changes to the THRIVE formula.

32. UPM continued thereafter to have significant production difficulties manufacturing Plaintiff's products, in subsequent production runs.

33. The product produced by UPM for Plaintiff using THRIVE material supplied by IP was visibly different from the product previously produced, showing striations on the surface of product, discoloration, surface puffing, burnt marks, coloring issues, and reflected other aesthetic abnormalities; and most of the product was defective in performance, with chipping at the edges, and with a product that would not lie flat on a surface, something that was essential for the The Original mine Pet Platter product to function correctly.

34. UPM consulted with experts in production, and with IP's THRIVE team which provided in put to UPM and Plaintiff, and UPM followed IP's recommendations in response to these issues, and produced several separate production runs of product using THRIVE material through October, 2018, but UPM was not able to successfully produce Plaintiff's product using the THRIVE mixture produced by IP.

35. IP suggested that the production problems were due to UPM, and continued to conceal that it had changed the composition of THRIVE; and guided Plaintiff to another manufacturer, Tailor Made Products, Inc.

36. Upon the recommendation and advice of IP, and after trying different lots of material and input from IP's THRIVE team, Plaintiff followed the advice and recommendation of IP's THRIVE team, and contacted Tailor Made Products ("TMP").

37. After discussion with TMP, and upon IP's continued recommendation, Plaintiff agreed to transfer its product molds and materials to TMP in late October 2018, at great expense and inconvenience to Plaintiff.

38. Nonetheless, TMP experienced similar production problems as UPM had experienced, in addition to many new ones, notwithstanding its continued attempts to manufacture Plaintiff's products using different lots of THRIVE material supplied by IP, and TMP's consultation with, and adherence to the recommendations of IP's THRIVE team.

39. TPM's last manufacturing run of Plaintiff's product resulted in TPM shutting down their manufacturing presses in between small runs in an attempt to improve the 'flatness' of the product, without success.

40. The product produced by TMP using THRIVE material provided by IP was therefore equally defective and unacceptable as it had been when produced by UPM.

41. In July, 2019, IP advised Plaintiff, as well as a significant number of other THRIVE customers, that it would be discontinuing its production and supply of THRIVE material, with very short notice, with no assistance in procuring other product, and with a refusal to allow other manufacturers to produce the THRIVE product for Plaintiff's use.

**IP's dilatory "compensation negotiation process"**

42. Plaintiff discussed with IP the significant costs, expenditures, and lost revenue and profits Plaintiff had experienced in connection with the defective products being produced from IP's product.

43. At no time has IP ever admitted to Plaintiff or agreed that the THRIVE material it produced and provided to manufacturers for Plaintiff's use was in any way defective, improperly produced, or a different material or mixture of THRIVE than had originally been supplied to Plaintiff by Weyerhaeuser, under the patented THRIVE mixture.

44. Instead, IP demanded and required a "compensation negotiation process" from Plaintiff, in response to Plaintiff's complaints.

45. IP's Catherine Slater, in a letter to Plaintiff dated December 17, 2019, requested formal documentation supporting Plaintiff's claims.

46. IP's "compensation negotiation process" required that Plaintiff itemize all of its costs, expenditures, and lost revenues, with detailed documentation reflecting that process.

47. Plaintiff complied, and spent significant time, cost and effort gathering such records to provide to IP; and provided the requested documentation to IP on February 10, 2020.

48. The documentation provided by Plaintiff demonstrated financial losses in the hundreds of thousands of dollars.

49. IP advised Plaintiff thereafter that its review of the material and the situation might take approximately three (3) months; but that it would try to facilitate the process to reduce the time frame.

50. On June 10, 2020, Plaintiff again formally requested in writing a response to the materials Plaintiff presented as part of IP's required "compensation negotiation process".

51. After the conclusion of the production of such material to IP, IP failed to respond over a period of months to Plaintiff, or Plaintiff's counsel, notwithstanding repeated emails, calls and efforts by Plaintiff to communicate with IP.

52. Thereafter, on December 7, 2020, IP offered payment in the total amount of $10,000 to compensate Plaintiff for its losses, and apparently concluded the "compensation negotiation process", without notifying Plaintiff.

**Plaintiff's Lost Business And Damaged Reputation**

53. Sales, introductions, and relationships in the pet product industry are primarily a show- and exhibit-driven business, including international, national, regional, city and neighborhood events spanning the entire year. Such exhibits reach consumer targets and permit contact with retailers, sales representatives, distributors and consumer customers.

54. A prerequisite for success at these shows is available inventory to sell, and the ability to fill orders obtained at such shows or exhibits quickly upon request, at and immediately following the show. Likewise, an inability to fulfill orders creates a lack of confidence among actual and potential buyers of product, and the reputation of a business can be made or dismantled when word of success, or, alternatively, inability to supply quality product, exists.

55. "Dogs Naturally Raw & Natural Summit" ("DNRS") was such an exhibit at the time Plaintiff's business was established; and Plaintiff attended the DNRS show in Rosemont, Illinois in 2018, along with approximately five-hundred other vendors and attendees.

56. Plaintiff successfully showed its products at the DNRS show, and sold and took orders for thousands of dollars of its product at the DNRS show.

57. However, Plaintiff was unable to meet the demand for product arising from Plaintiff's attendance at the DNRS show and other, similar and larger shows Plaintiff attended throughout the country and shows Plaintiff declined to attend, because Plaintiff was

unable to obtain enough product that was not defective from its product manufacturer that used the THRIVE mixture provided by IP.

**Defective THRIVE mix provided to other customers**

58. In 2016, when IP acquired the THRIVE formula, Plaintiff continued to utilize THRIVE for the manufacture of the The Original mine Pet Platter product, based on IP's representations that the transition would be "seamless".

59. At the same time, IP supplied THRIVE to a variety of other customers, for the manufacture of a variety of other products, including automobile parts for Ford Motor Company.

60. Unbeknownst to Plaintiff, shortly after IP acquired Weyerhauser's THRIVE formula and began producing its version of THRIVE, IP received a complaint from Ford Motor Company that products manufactured by and for Ford Motor Company using IP's THRIVE mixture were defective.

61. IP did not inform Plaintiff or Ford Motor Company that the THRIVE formula had been changed, but continued to provide the THRIVE mixture to Plaintiff, to Ford Motor Company and to others.

62. IP did not inform Plaintiff that other customers, including but not limited to Ford Motor Company, had also encountered similar manufacturing problems as Plaintiff had encountered with IP's version of the THRIVE mixture, notwithstanding that Plaintiff and IP's representatives had consulted and met in person and by phone dozens of times and communicated hundreds of times about the manufacturing difficulties Plaintiff had encountered through the defective THRIVE material IP had provided, and

notwithstanding IP's representatives' many suggestions and required changes in the production of product.

63. By failing to disclose that it had changed the THRIVE material mixture, Defendant IP caused Plaintiff actual harm, including the aggravation and nuisance that necessarily accompanied the change of production facilities, the inspection of product, and the monies paid to attempt to rectify the changed product.

### III. CLAIMS ALLEGED

### COUNT ONE

### 815 ILCS 505/1, *et seq.* - ILLINOIS CONSUMER FRAUD ACT

64. Paragraphs one (1) through sixty-four (64) are incorporated by reference as if fully set forth herein.

65. Defendant IP's actions and omissions, including those set forth in paragraphs 23, 29-32, 35-38, 41, 42, 44, 45, 50, 52, 53, and 59-64 were deceptive acts or practices of Defendant IP.

66. Plaintiff OPP is and was a "consumer" as defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c) and 505/1(e).

67. Defendant IP is a "person" as defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c) and 505/1(e).

68. The ICFA declares the following to be unlawful: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, *misrepresentation or the concealment,*

*suppression or omission of any material fact*, with intent that others rely upon the concealment, suppression or omission of such material fact.. in the conduct of any trade or commerce[.]" 815 ILCS 505/2 (*emphasis added*).

69. Defendant IP's conduct in labeling, marketing, distributing, and selling THRIVE while concealing, suppressing, or omitting the material fact that it changed the mix of materials constituting THRIVE, that the mix caused defects in product manufactured from the mix, and that the mix was the proximate cause of various defects in products created using THRIVE constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, omissions and unfair practices in the conduct of Defendant's trade or commerce.

70. Defendant intended that Plaintiff would rely on its concealment, suppression, or omission of material fact, and would continue to utilized the THRIVE mix Defendant caused to be produced and provided for the manufacture of Plaintiff's product.

71. The concealment, suppression, or omission is material because it concerns the type of information upon which Plaintiff would be expected to rely in deciding whether to continue to utilize THRIVE to make its products.

72. Because Defendant is in the business of manufacturing, marketing, distributing, and selling THRIVE, Defendant committed the unfair and deceptive acts in the conduct of its trade and commerce.

73. Defendant's practice of labeling, marketing, distributing, and selling the THRIVE blend without disclosing the material fact that it had changed the mixture of the blend offends public policy and is immoral, unethical, and unscrupulous.

74. Defendant's practice of labeling, marketing, distributing, and selling the THRIVE blend without disclosing the material fact that it was aware of the negative consequences of the change in the mixture of the THRIVE blend, and aware of complaints from other customers that its changes to the mixture of the blend had caused defects in the manufacture of other products, offends public policy and is immoral, unethical, and unscrupulous.

75. Defendant's conduct caused substantial economic injury to Plaintiff, and has irreparably damaged Plaintiff's reputation.

76. Plaintiff could not and did not expect to purchase the THRIVE mix with an undisclosed change that directly and negatively affected the process of manufacturing Plaintiff's products.

77. Plaintiff did not and could not know that, after years of using the THRIVE mix produced by Defendant's successor, Weyerhaeuser, and by Defendant, that Defendant began utilizing a different blend with the propensity to negatively affect the manufacturing process of Plaintiff's products.

78. Had the truth be known, Plaintiff would not have utilized Defendant's changed THRIVE mixture for its product.

79. Plaintiff was deceived by Defendant's concealment, suppression, or omission of material fact; and suffered economic damages as a proximate result of Defendant's unlawful conduct as alleged herein, including but not limited to the difference between the actual value of the THRIVE blend and the value of the blend if it had been as represented.

## COUNT TWO

## UNJUST ENRICHMENT,
## IN THE ALTERNATIVE TO COUNT THREE

80. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

81. By utilizing the THRIVE Blend, Plaintiff conferred a benefit on Defendant by paying for its THRIVE blend to manufacture its products.

82. Defendant appreciated the benefit because, were consumers including Plaintiff not to purchase its THRIVE mix, Defendant would have no sales of THRIVE and would generate no revenue, sales or profit for its manufacture of THRIVE.

83. Defendant retained that benefit, to the detriment of Plaintiff, who paid for product that was manufactured using THRIVE, but received product that was manufactured using a defective derivative of THRIVE.

84. Defendant's acceptance and retention of the benefit it received from the sale of its altered THRIVE mix is inequitable and unjust and violates the fundamental principles of justice, equity, and good conscience because the benefit it received was obtained by Defendant's deceptive, fraudulent, and misleading concealments, suppressions, or omissions of material fact about the THRIVE blend.

85. Equity cannot in good conscience permit Defendant to be economically enriched for such actions at Plaintiff's expense and in violation of Illinois law, and therefore restitution and/ or disgorgement of such economic enrichment is required.

## COUNT THREE

## THIRD PARTY BENEFICIARY
## BREACH OF CONTRACT

86. Plaintiff repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

87. UPM had valid and enforceable contracts with IP to purchase and utilize THRIVE material in the production of goods with third parties, including Plaintiff.

88. TMP also had valid and enforceable contracts with IP to purchase and utilize THRIVE material in the production of goods with third parties, including Plaintiff.

89. An example of the terms of such a contract appear in Exhibit 2.

90. Plaintiff performed all conditions required of it pursuant to such contracts, and paid all amounts sought or owed for compensation for the production of product.

91. IP breached its contracts and agreements with OPM and TMP, by failing to provide the quality of material it had promised and by failing to provide control of the quality of the material it provided.

92. As a result of IP's breach of its contracts and agreements with OPM and TMP, Plaintiff OPP was damaged and injured, because it could not supply sufficient product to its customers and potential customers, and it lost revenue and profits.

WHEREFORE, Plaintiff OPP seeks the entry of an order:

A. Declaring that Defendant IP is liable to Plaintiff for any and all losses Plaintiff has or may have sustained by IP's fraud, deceptive acts or omissions and misrepresentations of fact;

B. Enjoining Defendant IP from the further sale of its altered THRIVE mixture in products manufactured, sold or entered into the stream of commerce in the State of Illinois;

C. Awarding Plaintiff its actual damages; its general, compensatory, incidental, special and consequential damages, in an amount to be determined at trial;

D. Awarding Plaintiff punitive damages against Defendant IP, in an amount sufficient to punish Defendant and to deter Defendant and others from such conduct in the future;

E. Awarding Plaintiff pre-judgment interest on its damages;

F. Awarding Plaintiff its reasonable costs, including attorney's fees, incurred in prosecuting this matter; and

G. Awarding Plaintiff such other relief as this Court may deem appropriate and just.

### IV. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all claims in this Complaint so triable.

Dated: March 7, 2022

                Respectfully submitted,

                **Our Pet Project, LLC**

                By: /s/ Jeffrey Grant Brown
                Attorney for Plaintiff

Jeffrey Grant Brown
Jeffrey Grant Brown, P.C.
65 West Jackson Blvd., # 107
Chicago, IL 60604
312.789.9700
ARDC #6194262