**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **OUR PET PROJECT LLC ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.  22 cv 1209** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **INTERNATIONAL PAPER COMPANY,** | ) | |
| | ) | **Judge Mary M. Rowland** |
| **Defendant.** | ) | |

**<u>AMENDED COMPLAINT</u>**

Plaintiff, Our Pet Project, LLC, through its attorney, and for its Amended Complaint against Defendant, International Paper Company, alleges the following:

## I.      THE PARTIES AND JURISDICTION

1.      International Paper Company ("Defendant" or "IP")  is the internationally-known manufacturer of renewable, fiber-based packaging, pulp, paper, and other products.  IP is a corporation organized and existing under the laws of the State of New York.  IP's global headquarters is located in Memphis, Tennessee.  According to its website at https://www.internationalpaper.com/company, IP has manufacturing operations in North America, Latin America, Europe, North Africa and Russia; and it has more than 25,000 customers and employs more than 50,000 employees throughout the world.

2.      Plaintiff Our Pet Project ("Plaintiff" or "OPP") is a limited liability company, organized and existing under Illinois law; and is resident and a citizen of the State of Illinois.  Its principal, sole member and sole manager is a natural person, Ms. Carol Smeja, who is also

a resident and citizen of Illinois.

3.    This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332:  The
amount in controversy exceeds $75,000, exclusive of interest and costs; Plaintiff and its
sole member are both citizens of the State of Illinois; and Defendant is a citizen of the
States of New York and Tennessee.

4.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or
omissions giving rise to the claim occurred within this judicial district; and Defendant
conducted business within this judicial district at all times relevant to this Complaint.

## II.    FACTS

**THRIVE material production and its failure**

5.    Plaintiff is the originator of a certain product known as "The Original mine Pet Platter", a
patented feeding tray for domesticated pets, specifically for cats and dogs.

6.    "The Original mine Pet Platter" product has been manufactured since July, 2016.

7.    The Original mine Pet Platter has been manufactured from a composite blend of materials
that includes renewable cellulose mixed with polypropylene, a type of plastic, using a
specific formula called "THRIVE".

8.    THRIVE was raw material made of cellulose fiber and other ingredients, originally
formulated and supplied to Plaintiff and many other consumers by Weyerhaeuser, and
Weyerhaeuser applied for several patents on THRIVE, both in the United States and
internationally.

9.    In July, 2016, Weyerhaeuser was a manufacturer of certain paper and consumer products,
among other things.

10.    Weyerhaeuser contracted with Americhem to produce THRIVE.

11.     Americhem is a globally-recognized designer and manufacturer of synthetic fibers, engineered plastic compounds and related products.

12.     Americhem used a specialized, unique, confidential and proprietary process to mix, blend and create THRIVE from raw materials.

13.     Plaintiff originally sought to manufacture its products from a sustainable resource to create a BPA-free product, consisting of a more natural material than typical cheap materials and recycled plastics being used by other pet-industry competitors at the time; and sought a strong, durable and safe enough material to endure pet interaction with no exposure to dangerous toxins that was non-porous and dishwasher-safe, and made in the United States.

14.     Plaintiff learned about THRIVE material prior to the completion of development of its product, and contacted Weyerhaeuser; and Weyerhaeuser expressed great interest in working with Plaintiff to develop its products, and to jointly market Plaintiff's products and the THRIVE material from which Plaintiff's products would be made, to consumers generally.  *See, e.g.,* Exhibit 1, February 9, 2015 letter from Weyerhaeuser to Plaintiff.

15.     Weyerhaeuser represented that its THRIVE product consisted of a specific combination of ingredients, including cellulose fiber derived from wood pulp, mixed together in a proprietary, patented and defined formula, and available with complete fiber dispersion and impact resistance.

16.     Plaintiff's representatives, Carol Smeja and Bob Gailen, met with Rob Banning, an agent acting on behalf of Weyerhaeuser, in Plaintiff's office in Chicago, Illinois on March 20, 2014, and discussed the use of THRIVE Composites for Plaintiff's product.

17.     Plaintiff subsequently met in Chicago, Illinois with Jorge Cortes, a Weyerhaeuser

employee, and with other employees of Weyerhaeuser to discuss the possibility of Plaintiff's use of THRIVE in its products.

18.   Plaintiff met with Bob Morton, a consultant to Weyerhaeuser, in Chicago, at Embassy Suites, to explore the use of THRIVE for its products. Mr. Morton worked on the initial development and engineering of THRIVE.

19.   Plaintiff told Weyerhaeuser's representatives in these meetings that it intended to market and advertise its products to the market generally and consumers at large as being made from a sustainable resource, to be BPA-free, to consist of a more natural material than typical plastics being used by other pet-industry competitors; that it is strong and safe enough to endure pet interaction with no exposure to dangerous toxins; non-porous and dishwasher-safe; and made in the United States; and Weyerhaeuser told Plaintiff in these meetings that its THRIVE material would fulfill each of those criteria.

20.   Plaintiff was directed by Weyerhaeuser's representatives and consultants to a specific injection mold manufacturing processor that had experience working with the THRIVE product, United Plastic Molders, Inc. ("UPM") in Jackson, Mississippi.

21.   Plaintiff and Weyerhaeuser agreed that Weyerhaeuser would provide THRIVE for the production of Plaintiff's pet feeding tray products, and that UPM would act as the injection molder for Plaintiff's products since it had previous experience working with THRIVE.

22.   UPM became the original production manufacturer producing the "The Original mine Pet Platter" product for Plaintiff, starting in 2016, using Weyerhaeuser's formulation of THRIVE, and reflecting Plaintiff's labeling that advertised the product to consumers as "Food Safe, BPA Free, Made in USA, Dishwasher Safe, Sustainable, Recyclable and

100% SFI (Sustainable Forestry Initiative) Compliant."

23.     Rob Banning, on behalf of Weyerhaeuser, suggested that Plaintiff use Weyerhaeuser's 15DXV version of THRIVE.  Plaintiff then authorized UPM to place orders with Weyerhaeuser for that specific version of THRIVE for the production of Plaintiff's product; and UPM, Plaintiff, and Weyerhaeuser's representatives, including Rob Banning and Jorge Cortes, were each aware that each such order placed was specifically for the production of Plaintiff's product.  Rob Banning oversaw the ordering and selection of THRIVE product for Plaintiff as Plaintiff's production needs continued.

24.     Plaintiff never purchased THRIVE directly for its own use, nor for Plaintiff's resale in the ordinary course of its business, and never resold THRIVE in the ordinary course of its business.

25.     Instead, Plaintiff at all times purchased THRIVE in order to change THRIVE from the form in which it was purchased, which is a bb pellet-sized raw material used in the injection molding process, to produce a wholly separate product, Plaintiff's feeding trays that are used by consumers in the market generally.

26.     UPM experienced no unusual production difficulties or issues in the production of Plaintiff's products while using the THRIVE material supplied by Weyerhaeuser.

27.     Consistent with the parties' earlier discussions, Plaintiff's products included reference to the THRIVE composite in its marketing and packaging materials.

28.     Thus, Plaintiff's products were sold to the market generally with advertising and labeling reflecting Defendant's "THRIVE" patented name, also directed to the market generally, to all purchasers of the product made with THRIVE, and not merely "business purchasers".

29.     The Original mine Pet Platter was a successful product for Plaintiff, with orders in the

thousands of dollars placed in 2016, the first year of sales of its production, and an increase in orders in 2017.

30.     In its second year of production, Plaintiff increased the sales of The Original mine Pet Platter by 300% over its initial first year of production, through online sales direct to consumers generally, and through retail sales through a variety of pet supply stores.

31.     In approximately December, 2016, Plaintiff's agents, Bob Gailen and Carol Smeja, were informed in a conversation with Rob Banning in Chicago, Illinois that that Defendant IP would acquire THRIVE, as IP was to acquire the cellulose division and certain assets from Weyerhaeuser.

32.     In approximately December, 2016, from their office in Chicago, Illinois, Plaintiff's representatives, Gailen and Smeja, communicated in person and by telephone with Defendant's representatives, including Rob Banning, and members of the THRIVE team employed by and/or working for Defendant IP, and expressed great concern to IP about the acquisition and its continued supply of THRIVE. Plaintiff had established a successful working relationship with Weyerhaeuser, and had a significant investment in the development process and selection of material that resulted in a product that worked for Plaintiff completely as intended, and Plaintiff was reluctant to repeat that process of searching for an appropriate material to use for the production of its feeding trays.

33.     Plaintiff subsequently met in Chicago, Illinois with various members of the THRIVE team, including Jorge Cortes, who had worked for Weyerhaeuser and who were transitioning their employment to Defendant International Paper Company as part of the acquisition, and Mr. Cortes assured Plaintiff that the acquisition would have no effect on the availability or the quality of the product provided for Plaintiff.

34.   IP's representatives, including Rob Banning and Jorge Cortes, told Plaintiff both in meetings in Chicago, Illinois and in phone calls placed to Plaintiff's representatives and received by Plaintiff in its office in Illinois that IP would continue to be responsible for producing and overseeing quality control of THRIVE material; that the mixture comprising THRIVE would remain the same as it had when produced by Weyerhaeuser, and there would be no changes to the product; that confirmed that Plaintiff and IP could and would continue to market and advertise Plaintiff's products to the market generally as they had previously done; and told Plaintiff that THRIVE would be the exact same material and quality that Weyerhaeuser had previously provided.

35.   IP also told Plaintiff that the primary members of Weyerhaeuser's THRIVE team, including Jorge Cortes, Rob Banning, Catherine Slater, and Jim Lochary, would continue to be employed by or work for IP and remain part of Defendant's THRIVE team, following the acquisition by IP of Weyerhaeuser's cellulose division; and that the transition from Weyerhaeuser would be "seamless" in connection with the supply to Plaintiff of THRIVE for its production of the The Original mine Pet Platter product.

36.   Defendant's statements to Plaintiff as set forth above **in paragraphs 31-35** were made primarily and substantially in Illinois.  Plaintiff never traveled to Defendant's Memphis, Tennessee offices nor to its New York offices; Banning met frequently with Plaintiff in Chicago, Illinois; and Defendant's representatives almost always traveled to Chicago, Illinois to meet with Plaintiff, and made most communications, including those referenced above, via telephone with Plaintiff to her office and while in her office in Chicago, Illinois.

37.   IP intended that Plaintiff rely on each of those statements **in paragraphs 31-35** it made to

Plaintiff, so that Plaintiff would continue to conduct business with IP, and not attempt to secure another supplier of materials for the manufacture of Plaintiff's feeding trays.

38.    Plaintiff did rely on each of those statements.

39.    IP began thereafter to supply many consumers, including Plaintiff, with the THRIVE material mixture.

40.    Plaintiff never purchased THRIVE from Defendant directly for its own use, nor for Plaintiff's resale in the ordinary course of its business, and never resold THRIVE in the ordinary course of its business.

41.    Instead, Plaintiff at all times purchased THRIVE from Defendant in order to change THRIVE from the form in which it was purchased, which is a bb pellet-sized raw material, through the injection molding manufacturing processes, into a wholly separate product, its feeding trays that are used by consumers in the market generally.

42.    IP continued to prosecute the application of certain patents on THRIVE following the acquisition.

43.    IP's public announcement of its acquisition of the cellulose fiber business, which it called "Global Cellulose Fibers", admitted that the products it acquired and the business it intended to and did conduct through that acquisition implicated consumer protection concerns, stating in its public announcement:  "In this transaction, International Paper acquired five pulp mills and two converting facilities that produce fluff pulp, softwood pulp, and specialty pulp products **for a number of consumer applications** including diapers, other hygiene products, tissue, and textiles." (Emphasis supplied.)  https://www.prnewswire.com/news-releases/international-paper-finalizes-purchase-of-weyerhaeusers-pulp-business-300370642.html

44.    However, after the supplies of THRIVE that were previously provided by Weyerhaeuser to manufacture Plaintiff's product had been exhausted, and UPM began using THRIVE material supplied by Defendant International Paper Company in 2018, and as Plaintiff's products continued to be placed in retail stores and to be sold online to consumers in the market generally, Plaintiff began to observe, and to receive complaints from its customers about the failed quality of its products, and many consumers of Plaintiff's product made from THRIVE demanded refunds and/or replacement products, which demands were honored by Plaintiff.

45.    Plaintiff's products suddenly appeared, following production, with "undispersed cellulose fibers" (as described by IP's representatives) across all physical areas of the product, including the front, back and sides, which had never been seen before.  Plaintiff advised IP's representatives, including Jorge Cortes and Rob Banning, by telephone from Plaintiff's Chicago office, immediately upon learning of the production of defective products.

46.    IP communicated with Plaintiff in its Chicago, Illinois office and requested that Plaintiff open every box of product that had been shipped to Plaintiff's Chicago, Illinois storage facility on North Clybourn Street (that facility held Plaintiff's product for shipment to retail customers and for online sale to consumers in the market generally), and to count the number of Pet Platters displaying these fibers, in order to quantify the magnitude of the problem.

47.    Plaintiff performed the count of defective products at its own cost; the count of defective products ranged from 70% to 89% of each size and color of Plaintiff's product.

48.    Plaintiff's representative, Smeja, met with Defendant's representatives, including Jorge

Cortes, Molly Schmidt and Elijah Muhammad in June, 2018 in Chicago, Illinois to discuss quality control issues, and Defendant IP's efforts to improve quality; and specifically to discuss the use of the THRIVE name in labeling and packaging of Plaintiff's products.

49.   Defendant was simultaneously continuing to use, display and advertise the THRIVE name through the sale of other consumer products made with, from or using THRIVE to the market generally, not just business consumers, and Defendant's representatives Schmidt and Muhammad discussed with Plaintiff its desire to broaden such marketing efforts, using a model similar to that which IP and Plaintiff had been using for Plaintiff's products. See, *e.g.*, Exhibit 2.

50.   Jorge Cortes subsequently met with Smeja in Chicago in approximately August, 2018 to discuss the production issues which had arisen and to assure Plaintiff that the problems would be successfully resolved.

51.   IP told Plaintiff that it concluded that an improper moisture content was responsible for the product defect; and sent replacement THRIVE material to UPM.   In addition, IP, through the individuals on its THRIVE team, including Jorge Cortes, stated that it had introduced a highly-documented Quality Control plan to ensure that no additional manufacturing problems would occur.

52.   However, the true cause of the defects in Plaintiff's product was that IP had changed the composition, formula, mixture, and/or process for mixing the THRIVE product from the THRIVE product originally provided to Plaintiff that was produced through Weyehaeuser.

53.   IP had also ceased to work with Americhem, with its specialized, unique, confidential and proprietary process of mixing, blending and creating THRIVE from raw materials.

54.    IP never told Plaintiff and concealed from Plaintiff and all consumers of THRIVE that IP had changed the composition, formula, mixture, and/or process for mixing all of the THRIVE product it sold from that previously produced through Weyehaeuser; and that it was aware that its changes made a material difference in the suitability of the material for use in manufacturing Plaintiff's products and all products previously made from THRIVE.

55.    As Defendant knows and as its records will reflect, Plaintiff never consented in any manner, nor authorized, desired or permitted Defendant to make changes to the composition, formula, mixture, and/or process for mixing the THRIVE material provided to Plaintiff.

56.    UPM continued thereafter to have significant production difficulties manufacturing Plaintiff's products, in subsequent production runs.

57.    The feeding trays produced by UPM using THRIVE material supplied by IP were visibly different from the product previously produced using THRIVE material supplied by Weyerhaeuser, showing striations on the surface of product, discoloration, surface puffing, burnt marks, coloring issues, and reflected other aesthetic abnormalities; and most of the product was defective in performance, demonstrating chipping at the edges; and the product would not lie flat on a surface, something that was essential for the The Original mine Pet Platter product to function correctly.

58.    UPM consulted with experts in production, and with IP's THRIVE team which provided input to UPM and Plaintiff, and UPM followed IP's recommendations in response to these issues, and produced several separate production runs of product using THRIVE material through October, 2018.  However, UPM was not able to successfully produce Plaintiff's product using the THRIVE mixture produced by IP.

59.    IP told Plaintiff that the production problems were due to UPM; never admitted that it had changed the composition, formula, mixture, and/or process for mixing THRIVE; and continued to conceal that it had changed the composition of THRIVE; and instead insisted that Plaintiff move production to another manufacturer, Tailor Made Products, Inc., rather than admit that the manufacturing difficulties experienced by Plaintiff were because of Defendant's change to THRIVE.

60.    Specifically, Rob Banning told Plaintiff's representative, Carol Smeja, in a telephone conversation in September, 2018 that Plaintiff received in Plaintiff's Chicago, Illinois office that if Plaintiff did not move production to a different injection molder from UPM, IP and its THRIVE team would no longer support Plaintiff, and Plaintiff would be left to resolve the production issues of THRIVE on its own.

61.    Rob Banning, acting for IP, contacted another injection molder, Tailor Made Products ("TMP"), located in Wisconsin, to arrange a meeting with TMP to take over the production of Plaintiff's products.

62.    In response to that position,  Plaintiff followed the demand of IP's THRIVE team, and met with Rob Banning and TMP's operations manager, Jamie Kuhn, who provided a tour of TMP's facility.  Mr. Kuhn told Plaintiff that Plaintiff's product "is a real simple part to do", and there would be no problem manufacturing the part.

63.    After discussion with TMP, and upon IP's continued insistence, Plaintiff assented to IP's coercion to transfer its product molds and materials to TMP in late October 2018, at great expense and inconvenience to Plaintiff.  TMP increased its pricing significantly over UPM's pricing to produce the exact same products UPM had previously produced.

64.    Nonetheless, TMP experienced similar production problems as UPM had experienced, in

addition to many new ones, notwithstanding its continued attempts to manufacture
Plaintiff's products using different lots of THRIVE material supplied by IP, and TMP's
consultation with, and adherence to the recommendations of IP's THRIVE team.

65. TMP's last manufacturing run of Plaintiff's product resulted in TMP shutting down their
manufacturing presses in between small runs in an attempt to improve the 'flatness' of the
product, without success.

66. The product produced by TMP using THRIVE material provided by IP was therefore
equally defective and unacceptable as it had been when produced by UPM.

67. In July, 2019, IP advised Plaintiff, and, upon information and belief, all of its THRIVE
customers, that it would be discontinuing its production and supply of THRIVE material,
with very short notice, with no assistance in procuring other product, and with a refusal to
allow other manufacturers to produce the THRIVE product for Plaintiff's use.

**IP's dilatory "compensation negotiation process"**

68. Plaintiff discussed with IP the significant costs, expenditures, and lost revenue and profits
Plaintiff had experienced in connection with the defective products being produced from
IP's product.

69. At no time has IP ever admitted to Plaintiff or agreed that the THRIVE material it
produced and provided to manufacturers for Plaintiff's use was in any way defective,
improperly produced, or a different material or mixture of THRIVE than had originally
been supplied to Plaintiff by Weyerhaeuser, under the patented THRIVE mixture.

70. Instead, IP demanded and required a "compensation negotiation process" from Plaintiff, in
response to Plaintiff's complaints.

71. IP's Catherine Slater, in a letter to Plaintiff dated December 17, 2019, requested formal

documentation supporting Plaintiff's claims.

72.   IP's "compensation negotiation process" required that Plaintiff itemize all of its costs, expenditures, and lost revenues, with detailed documentation reflecting that process.

73.   Plaintiff complied, and spent significant time, cost and effort gathering such records to provide to IP; and provided the requested documentation to IP on February 10, 2020.

74.   The documentation provided by Plaintiff demonstrated financial losses in the hundreds of thousands of dollars.

75.   IP advised Plaintiff thereafter that its review of the material and the situation might take approximately three (3) months; but that it would try to facilitate the process to reduce the time frame.

76.   On June 10, 2020, Plaintiff again formally requested in writing a response to the materials Plaintiff had presented as part of IP's required "compensation negotiation process".

77.   After the conclusion of the production of such material to IP, IP failed to respond over a period of months to Plaintiff, or Plaintiff's counsel, notwithstanding repeated emails, calls and efforts by Plaintiff to communicate with IP.

78.   Thereafter, on December 7, 2020, IP offered payment in the total amount of $10,000 to compensate Plaintiff for its losses, which Plaintiff rejected.

79.   IP continued to request additional information from Plaintiff, and Plaintiff continued to provide IP with additional information it requested through August, 2021.

**Plaintiff's Lost Business And Damaged Reputation**

80.   Sales, introductions, and relationships in the pet product industry are primarily a show- and exhibit-driven business, including international, national, regional, city and neighborhood events spanning the entire year. Such exhibits reach consumer targets and

permit contact with retailers, sales representatives, distributors and consumer customers.

81.   A prerequisite for success at these shows is available inventory to sell, and the ability to fill orders obtained at such shows or exhibits quickly upon request, at and immediately following the show.  Likewise, an inability to fulfill orders creates a lack of confidence among actual and potential buyers of product, and the reputation of a business can be made or dismantled when word of success, or, alternatively, inability to supply quality product, exists.

82.   "Dogs Naturally Raw & Natural Summit" ("DNRS") was such an exhibit at the time Plaintiff's business was established; and Plaintiff attended the DNRS show in Rosemont, Illinois in 2018, along with approximately five-hundred other vendors and attendees.

83.   Plaintiff successfully showed its products at the DNRS show, and sold and took orders for thousands of dollars of its product at the DNRS show.

84.   However, Plaintiff was unable to meet the demand for product arising from Plaintiff's attendance at the DNRS show and other, similar and larger shows Plaintiff attended throughout the country and shows Plaintiff declined to attend, because Plaintiff was unable to obtain enough product that was not defective from its product manufacturer that used the THRIVE mixture provided by IP.

**Defective THRIVE mix provided to other customers**

85.   In 2016, when IP acquired the THRIVE formula, Plaintiff continued to utilize THRIVE for the manufacture of the The Original mine Pet Platter product, based on IP's representations that the transition would be "seamless" and the THRIVE material Defendant would provide Plaintiff would be the same THRIVE material Plaintiff had previously been provided when Weyerhaeuser produced THRIVE.

86.    IP intended that Plaintiff rely on IP's representation to Plaintiff that the transition would be "seamless" and the THRIVE material would be the same.

87.    IP's representatives, including Jorge Cortes and Rob Banning, discussed with Plaintiff the production and quality of THRIVE desired by Plaintiff for its manufacture of its feeding tray products. Plaintiff always required 15 DX<u>V</u> - "virgin" - THRIVE product, which was a more expensive material, though IP also had available recycled product - 15 DX<u>R</u> - "recycled" - and IP knew that the more expensive 15 DXV product ordered by UPM and TMP was to be used specifically for Plaintiff's products.

88.    In fact, Rob Banning worked as a contracted sales person for Defendant IP, and Banning also sold THRIVE material from IP to TMP. Thus, as IP's agent, Banning knew the specific product ordered by TMP from IP would be used specifically and exclusively for the manufacture of Plaintiff's feeding tray products and only those products; and Banning discussed that fact with other IP representatives, including Jorge Cortes and Vladmir Lisenko, when THRIVE was ordered to manufacture Plaintiff's products.

89.    At the same time, IP supplied THRIVE to a variety of other customers, for the manufacture of a variety of other products, including automobile parts for Ford Motor Company.

90.    Unbeknownst to Plaintiff, shortly after IP acquired Weyerhauser's THRIVE formula and began producing its version of THRIVE, IP received a complaint from Ford Motor Company that products manufactured by and for Ford Motor Company using IP's THRIVE mixture were defective.

91.    IP did not inform Plaintiff or Ford Motor Company that the THRIVE formula, material mixture, processing or formulation had been changed, but continued to provide the

THRIVE mixture to Plaintiff, to Ford Motor Company and to other consumers of its
THRIVE product

92. IP did not inform Plaintiff that other customers, including but not limited to Ford Motor
Company, had also encountered similar manufacturing problems as Plaintiff had
encountered with IP's version of the THRIVE mixture, notwithstanding that Plaintiff and
IP's representatives had consulted and met in person and by phone dozens of times and
communicated hundreds of times about the manufacturing difficulties Plaintiff had
encountered through the defective THRIVE material IP had provided, and
notwithstanding IP's representatives' many suggestions and required changes in the
production of product.

93. Plaintiff was sufficiently concerned that Defendant had somehow changed the
composition, formula, mixture, and/or process for mixing THRIVE that Plaintiff's
representative, Ms. Smeja, asked Defendant's representatives, Jorge Cortes and Jim
Lochary, in an email on July 8, 2019, about such changes and if there were any additives
added to THRIVE; and Defendant's response, on July 26, 2019, did not disclose that there
were any additives, and instead stated that the formulation has remained consistent.

94. By failing to disclose that it had changed the composition, formula, mixture, and/or
process for mixing THRIVE, Defendant IP caused actual harm to Plaintiff and all
consumers of the material Defendant sold as THRIVE, including the manufacturing
delays, additional costs and lost sales to Plaintiff that necessarily accompanied the change
of production facilities, Plaintiff's inspection of the defective product, the monies paid to
attempt to rectify the changed product, and the monies paid by all consumers who had
sought the attributes of THRIVE claimed by Defendant.

95.   Defendant's conduct in changing the composition, formula, mixture, and/or process for mixing THRIVE without informing Plaintiff of that change, and denying that it had made any such change, was and is likely to harm consumers in the colloquial sense of the ultimate buyers of the finished product.

96.   Bob Morton, who was not retained by IP after its acquisition of Weyerhaeuser's cellulose fiber division, reviewed samples of the defective THRIVE product produced by IP and confirmed that the THRIVE material had been changed from the original material he helped develop while at Weyerhaeuser.

### III.   CLAIMS ALLEGED

### COUNT ONE

### 815 ILCS 505/1, *et seq.* - ILLINOIS CONSUMER FRAUD ACT

97.   Each of the previous paragraphs are incorporated by reference as if fully set forth herein.

98.   The intent of the Illinois Consumer Fraud and Deceptive Business Practices Act ("the Act") is "to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014) *citing Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir.2010) (*citing Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 416–17, 266 Ill.Dec. 879, 775 N.E.2d 951 (2002)).

99.   Any person who suffers actual damage as a result of a violation of the Act committed by any other person may bring an action against such person.   815 Ill. Comp. Stat. Ann. 505/10a.

100.  Defendant is a "person", and "committed" a "violation" of one or more provisions of the Illinois Consumer Fraud Act, as those terms are used and defined by the Illinois Consumer

Fraud Act.

101.   Plaintiff OPP is and was at all times relevant a "consumer", a "business person",  and a

"person" as those terms are used and defined by the Illinois Consumer Fraud and

Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c) and 505/1(e).

102.   Defendant IP is a "person",  and "committed" a "violation" of one or more provisions of

the Illinois Consumer Fraud Act, as those terms are used and defined by the Illinois

Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c)

and 505/1(e), by selling a product that it claimed to be THRIVE but which was not

THRIVE.

103.   Plaintiff is a "consumer" of THRIVE under the definition required in the Act.

104.   The ICFA declares the following to be unlawful: "Unfair methods of competition and

unfair or deceptive acts or practices, including but not limited to the use or employment of

any deception, fraud, false pretense, false promise, *misrepresentation or the concealment,*

*suppression or omission of any material fact*, with intent that others rely upon the

concealment, suppression or omission of such material fact.. in the conduct of any trade or

commerce[.]" 815 ILCS 505/2 (*emphasis added*).

105.   Defendant IP's actions and omissions, including those set forth in paragraphs 31-35, 43,

46, 48-51, 54, 58-61, 67, 69, 70, 75, 77-79, 85-87 and 90-94 were deceptive acts or

practices of Defendant IP.

106.   Defendant IP's conduct in labeling, marketing, distributing, and selling material it claimed

to be THRIVE while concealing, suppressing, or omitting the material fact that it changed

the mix of materials constituting THRIVE, that the mix caused defects in product

manufactured from the mix, and that the mix was the proximate cause of various defects

in products created using THRIVE constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, omissions and unfair practices in the conduct of Defendant's trade or commerce.

107. Defendant intended that Plaintiff would rely on its concealment, suppression, or omission of material fact, and would continue to utilize the THRIVE mix Defendant caused to be produced and provided for the manufacture of Plaintiff's product.

108. The concealment, suppression, or omission is material because it concerns the type of information upon which Plaintiff would be expected to rely in deciding whether to continue to utilize THRIVE to make its products.

109. Because Defendant is in the business of manufacturing, marketing, distributing, and selling THRIVE, Defendant committed the unfair and deceptive acts in the conduct of its trade and commerce.

110. Defendant's practice of labeling, marketing, distributing, and selling the THRIVE blend without disclosing the material fact that it had changed the mixture of the blend offends public policy and is immoral, unethical, and unscrupulous.

111. Defendant's practice of labeling, marketing, distributing, and selling the THRIVE blend without disclosing the material fact that it was aware of the negative consequences of the change in the mixture of the THRIVE blend, and aware of complaints from other customers that its changes to the mixture of the blend had caused defects in the manufacture of other products, offends public policy and is immoral, unethical, and unscrupulous.

112. Defendant's conduct caused substantial economic injury to Plaintiff, and has irreparably damaged Plaintiff's reputation.

113.     Plaintiff could not and did not expect to purchase the THRIVE mix with an undisclosed change that directly and negatively affected the process of manufacturing Plaintiff's products.

114.     Plaintiff did not and could not know that, after years of using the THRIVE mix produced by Defendant's predecessor, Weyerhaeuser, and supplied by Defendant, that Defendant began utilizing a different blend with the propensity to negatively affect the manufacturing process of Plaintiff's products.

115.     Had the truth be known, Plaintiff would not have utilized Defendant's changed THRIVE mixture for its product.

116.     Plaintiff was deceived by Defendant's concealment, suppression, or omission of material fact; and suffered economic damages as a proximate result of Defendant's unlawful conduct as alleged herein, including but not limited to the difference between the actual value of the THRIVE blend and the value of the blend if it had been as represented.

## COUNT TWO

### 815 ILCS 505/1, *et seq.* - ILLINOIS CONSUMER FRAUD ACT

117.     Each of the previous paragraphs are incorporated by reference as if fully set forth herein.

118.     This Count II is pleaded as an alternative to Count One, to conform to any requirement that, to bring a suit under the Illinois Consumer Fraud Act, a business purchaser must "satisfy the "consumer nexus test".  Order of January 10, 2023, Doc. # 28, p. 8.

119.     The intent of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") is "to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014) *citing Siegel v. Shell Oil Co.*, 612 F.3d 932,

934 (7th Cir.2010) (*citing Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 416–17, 266 Ill.Dec. 879, 775 N.E.2d 951 (2002)).

120. Any person who suffers actual damage as a result of a violation of the Illinois Consumer Fraud Act committed by any other person may bring an action against such person. 815 Ill. Comp. Stat. Ann. 505/10a.

121. Defendant is a "person", and "committed" a "violation" of one or more provisions of the Illinois Consumer Fraud Act, as those terms are used and defined by the Illinois Consumer Fraud Act.

122. Plaintiff OPP is and was at all times relevant a "consumer", a "business person", and a "person" as those terms are used and defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c) and 505/1(e).

123. Defendant IP is a "person", and "committed" a "violation" of one or more provisions of the Illinois Consumer Fraud Act, as those terms are used and defined by the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1(c) and 505/1(e).

124. The ICFA declares the following to be unlawful: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, *misrepresentation or the concealment, suppression or omission of any material fact*, with intent that others rely upon the concealment, suppression or omission of such material fact.. in the conduct of any trade or commerce[.]" 815 ILCS 505/2 (*emphasis added*).

125. Defendant IP's actions and omissions, including those set forth in paragraphs 31-35, 43, 46, 48-51, 54, 58-61, 67, 69, 70, 75, 77-79, 85-87 and 90-94 were deceptive acts or

practices of Defendant IP.

126. In addition, Defendant's conduct in failing to disclose its change in the composition, formula, mixture, and/or process for mixing the THRIVE material, which change in turn caused THRIVE's failure, involved trade practices addressed to the market generally, and otherwise implicates consumer protection concerns.

127. The market for THRIVE product consists of consumers who consume THRIVE.

128. The ultimate consumers of THRIVE made by Defendant International Paper Company were the hundreds or thousands of individual consumer purchasers of products made from the material that Defendant represented to be THRIVE, who purchased those products at retail for their own use and who did not know that the product would fail because it was not actually made from the THRIVE formula as Defendant claimed.

129. Defendant IP's conduct in labeling, marketing, distributing, and selling material which it claimed to be THRIVE while concealing, suppressing, or omitting the material fact that it changed the mix of materials constituting THRIVE concerns consumers other than Plaintiff, since all consumers of all product purportedly made from THRIVE but actually made from a defective mix that is not THRIVE have purchased and consumed a defective product.

130. Defendant's deception was not an isolated act between Plaintiff and Defendant; instead, it constitutes the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, omissions and unfair practices in the conduct of Defendant's trade or commerce that was directed to and affects the market of all buyers of product purportedly made from THRIVE generally.

131. Defendant intended that Plaintiff and all consumers of THRIVE would rely on

Defendant's concealment, suppression, or omission of material fact from Plaintiff and such consumers, and intended that Plaintiff and all consumers of THRIVE would continue to utilize the THRIVE mix Defendant caused to be produced and provided for the manufacture of product supposedly made from THRIVE.

132.  The concealment, suppression, or omission is material because it concerns the type of information upon which Plaintiff and consumers in the market generally would be expected to rely upon in deciding whether to continue to consumer THRIVE.

133.  Plaintiff's actions in relying on Defendant's representations about what THRIVE was made of, and in relying upon Defendant's representations that THRIVE would continue to be made in the same manner as it had been when Weyerhauser made THRIVE, and in relying on Defendant's denial that it had changed the formula, composition or makeup of THRIVE, were akin to a consumer's actions.

134.  Because Defendant was in the business of manufacturing, marketing, distributing, and selling THRIVE, Defendant committed the unfair and deceptive acts in the conduct of its trade and commerce.

135.  Defendant's practice of labeling, marketing, distributing, and selling the THRIVE blend without disclosing the material fact that it had changed the mixture of the blend offends public policy and is immoral, unethical, and unscrupulous.

136.  Defendant's practice of labeling, marketing, distributing, and selling the THRIVE blend without disclosing the material fact that it was aware of the negative consequences of the change in the mixture of the THRIVE blend, and aware of complaints from other consumers that its changes to the mixture of the blend had caused defects in the manufacture of other products, offends public policy and is immoral, unethical, and

unscrupulous.

137. Defendant's conduct caused substantial economic injury to Plaintiff and to consumers generally, and has irreparably damaged Plaintiff's reputation.

138. Plaintiff and consumers generally were deceived by Defendant's concealment, suppression, or omission of material fact; and suffered economic damages as a proximate result of Defendant's unlawful conduct as alleged herein, including but not limited to the difference between the actual value of the THRIVE blend and the value of the blend if it had been as represented.

## COUNT THREE

## COMMON LAW FRAUD

139. Each of the previous paragraphs are incorporated by reference as if fully set forth herein.

140. Defendant IP, through its agents, including but not limited to Vladimir Lisenko, Jim Lochary and Jorge Cortes, concealed from Plaintiff's agent, Carol Smeja, that Defendant IP had changed the composition, formula, mixture, and/or process for mixing the THRIVE material from the composition, formula, mixture, and/or process for mixing the THRIVE material Defendant IP had previously provided to Plaintiff, such that the product Defendant sold to Plaintiff and for Plaintiff's use in making its pet platter products was not THRIVE.

141. Defendant represented to Plaintiff that it was THRIVE 15DXV; but in fact the material it provided was not THRIVE 15DXV.

142. Plaintiff, through its agent, Smeja, asked Defendant IP's agents, including Vladimir Lisenko, Jim Lochary and Jorge Cortes, as set forth above in paragraphs 93-94 if IP had changed the composition, formula, mixture, and/or process for mixing the THRIVE

material after Defendant supplied product to Plaintiff following its acquisition of Weyerhaeuser's cellulose fiber division; and Defendant did not disclose that it had changed the composition, formula, mixture, and/or process for mixing the THRIVE material.

143. Defendant's changes to the THRIVE product it provided to Plaintiff made a material difference in the suitability of the material for use in Plaintiff's products, as described above in paragraphs 56, 57, 59 and 96.

144. Defendant IP knew that it intended to permanently cease production of THRIVE for many months prior to the date it notified Plaintiff that it would permanently cease production of THRIVE, but did not provide Plaintiff with sufficient advance notice of its cessation of production; and, when it finally did notify Plaintiff, refused to allow Plaintiff to obtain THRIVE product from any other producer, including Americhem.

145. Defendant intended to induce Plaintiff to continue to order THRIVE material from Defendant by failing to disclose that it had changed the composition, formula, mixture, and/or process for mixing the THRIVE material.

146. Defendant also intended to induce Plaintiff to continue to order THRIVE material from Defendant, and intended to induce Plaintiff to not seek alternative material from third parties, by failing to disclose, and providing short notice, that it intended to permanently cease the production of THRIVE.

147. Plaintiff relied upon Defendant's representation that its material was the same as previously provided to Plaintiff by Weyerhaeuser, and relied upon Defendant's explanation and expertise in directing Plaintiff to change manufacturers, as set forth in paragraphs 59-60.

148. Had Plaintiff known that Defendant had changed its formula, mixture, and/or process for mixing the THRIVE material, Plaintiff would have acted differently, by seeking a substitute material to make its products.

149. Had Plaintiff known in advance that Defendant intended to permanently cease production of THRIVE, Plaintiff would have begun the process of finding a substitute material to make its products much earlier.

150. Plaintiff's reliance on Defendant's continued concealment of the fact that it had changed its formula, mixture, and/or process for mixing the THRIVE material was reasonable, since Plaintiff asked Defendant if there was a change, and Defendant denied it, and instead directed Plaintiff to take other actions to resolve the manufacturing problems, including moving its manufacturing to a different facility.

151. Plaintiff's reliance on Defendant's continued concealment of the fact that it had changed its formula, mixture, and/or process for mixing the THRIVE material led to Plaintiff's damages in the form of lost revenue and income, and injury to its reputation, because Plaintiff could not supply its product to the market generally, because it had little or no product to supply.

## COUNT FOUR

### THIRD PARTY BENEFICIARY
### BREACH OF CONTRACT

152. Each of the previous paragraphs are incorporated by reference as if fully set forth herein.

153. As set forth above, Defendant IP acquired Weyerhaeuser's cellulose fiber division; and Defendant IP assumed Weyerhaeuser's obligations and liabilities for executory contracts pertaining to the manufacture, sale and delivery of THRIVE by Weyerhaeuser, including

such contracts between Weyerhaeuser and UPM, and Weyerhaeuser and TMP.

154. As set forth above, Defendant IP knew that the product UPM and TMP ordered from Weyerhaeuser and from Defendant was specifically intended for Plaintiff's use, since it was actually ordered by Defendant's agent, Rob Banning, who was also Plaintiff's agent, and acted as such when Banning ordered THRIVE for Plaintiff's use.

155. UPM had valid and enforceable contracts with IP to purchase and utilize THRIVE material in the production of goods for Plaintiff.

156. TMP also had valid and enforceable contracts with IP to purchase and utilize THRIVE material in the production of goods for Plaintiff; an example of the terms of such a contract appear in Exhibit 3.

157. IP's communications with Plaintiff contain an express declaration that those contracts were made for the direct benefit of Plaintiff; see, Exhibits 3, 4.

158. Plaintiff performed all conditions required of it pursuant to such contracts, and paid all amounts sought or owed for compensation for the production of product.

159. IP breached its contracts and agreements with OPM and TMP, by failing to provide the quality of material it had promised and by failing to provide control of the quality of the material it provided.

160. As a result of IP's breach of its contracts and agreements with OPM and TMP, Plaintiff OPP was damaged and injured, because it could not supply sufficient product to its customers and potential customers, and it lost revenue and profits.

## COUNT FIVE

## BREACH OF CONTRACT

161. Each of the previous paragraphs are incorporated by reference as if fully set forth herein.

162.   Defendant IP offered and promised Plaintiff that it would make sure that issues arising from the defective product Defendant had previously provided Plaintiff would be resolved.

163.   Defendant offered and promised to Plaintiff that it would make sure that its quality standards are communicated and enforced.

164.   Defendant offered and promised to Plaintiff to provide Plaintiff with sufficient THRIVE material to meet its future needs for Plaintiff's demand for the THRIVE material.

165.   Defendant offered and promised to Plaintiff to correctly manufacture its THRIVE material to meet Plaintiff's demand, based upon Plaintiff's prior requirements and output. See, Exhibit 4.

166.   Plaintiff accepted Defendant's promises, and promised to continue to conduct business with Defendant and to pay for THRIVE material.

167.   Plaintiff performed all of its obligations under the parties' agreement.

168.   The essential terms of the parties' agreement are as set forth in Exhibit 4, and as followed by the parties' course of dealing and subsequent conduct.

169.   Nonetheless, Defendant breached its promises to Plaintiff by failing to provide the quality of the THRIVE material it promised.

170.   Plaintiff suffered damages including additional costs and lost profits from Defendant's failure to provide the product as promised.


   WHEREFORE, Plaintiff OPP seeks the entry of an order:

   A.   Declaring that Defendant IP is liable to Plaintiff for any and all losses Plaintiff has or may have sustained by IP's fraud, deceptive acts or omissions and misrepresentations of

fact;

B.    Enjoining Defendant IP from the further sale of its altered THRIVE mixture in products manufactured, sold or entered into the stream of commerce in the State of Illinois;

C.    Awarding Plaintiff its actual damages; its general, compensatory, incidental, special and consequential damages, in an amount to be determined at trial;

D.    Awarding Plaintiff punitive damages against Defendant IP, in an amount sufficient to punish Defendant and to deter Defendant and others from such conduct in the future;

E.    Awarding Plaintiff pre-judgment interest on its damages;

F.    Awarding Plaintiff its reasonable costs, including attorney's fees, incurred in prosecuting this matter; and

G.    Awarding Plaintiff such other relief as this Court may deem appropriate and just.

## IV.    **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury of all claims in this Complaint so triable.

Dated: January 27, 2023

Respectfully submitted,

**Our Pet Project, LLC**

By: /s/ Jeffrey Grant Brown
Attorney for Plaintiff

Jeffrey Grant Brown
Jeffrey Grant Brown, P.C.
65 West Jackson Blvd., # 107
Chicago, IL 60604
312.789.9700
ARDC #6194262

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that he caused to be served on the attorneys of record for Defendant listed below, via the CM/ECF filing of this document, on this 27th day of January, 2023.

Michael Hayes -      Michael.Hayes@huschblackwell.com
Michael Hopkins -    Michael.Hopkins@huschblackwell.com

Respectfully submitted,

/s/ Jeffrey Grant Brown
Jeffrey Grant Brown